77 448
f225 173

# Craig's Administrator's Appeal.

1. Retention of possession by the former owner of a chattel sold at sheriff's sale is not an index of fraud, the sale being the act of the law, not of the person retaining.

2. A judicial sale being conducted by an officer of the law, is deemed to be fair till proved to be otherwise.

3. A chattel purchased at a judicial sale may be left in the possession of the former owner, on any contract of bailment which the law allows in other cases.

4. A judgment was confessed by Shoemaker, execution issued on it, and furniture, &c., of Shoemaker, who was tenant of an hotel, bought at sheriff's sale by Craig, the plaintiff. He afterwards bought the lease of the hotel, and after a year from the sale of the personal property, put Shoemaker into the hotel as his agent; he occupied it for four years, when he died: Craig was his administrator. On the settlement of the administration account, creditors of Shoemaker asked to surcharge the account with the value of the furniture, &c., on the ground that the judgment and sheriff's sale were fraudulent. *Held,* that after so long delay, nothing short of clear, decisive and unmistakable evidence should avoid the transfer of title by the sheriff's sale.

5. The payment by Craig of debts contracted by Shoemaker whilst he kept the hotel, was consistent with Craig's ownership and Shoemaker's agency.

6. Inadequacy of price of property sold at sheriff's sale, will not alone affect proceedings conducted in accordance with the forms of law.

7. After a report by an auditor that the sale was fraudulent, the Orphans' Court directed an issue to the Common Pleas to try that question; the jury found that it was not, and a rule for a new trial was discharged. The Orphans' Court disregarded the finding of the jury and confirmed the report of the auditor. *Held,* that the verdict should have controlled the decree of the Orphans' Court.

8. In questions of fraud, evidence of acts done before any rights of the parties charging fraud had supervened, which tend to illustrate the conduct of the parties, and develop their relations, is admissible.

9. Myers *v.* Harvey, 2 Penna. R. 478, recognised.

February 17th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from the Orphans' Court of *Philadelphia:* Of July Term 1873, No. 6½. In the matter of the account of James Craig

and Catharine Shoemaker, administrators, &c., of N. Kline Shoemaker, deceased.

The decedent died October 20th 1865. The administrators above named filed their account March 13th 1867. They charged themselves with $354.60, the amount of the inventory of the personal estate, and claimed credits, including $300 retained by the widow under the exemption laws, amounting to $707, leaving a balance of $352.40 due the administrators. C. F. Erickson, Esq., was appointed auditor, to audit and adjust the account, and distribute the balance in the hands of the administrators.

James Craig, one of the administrators, died in January 1868, and administration of his estate was granted to R. C. Craig and John Maugle. The auditor's first hearing was on the 30th of April 1868.

John Hertzler, Harry Hertzler and John Heath, creditors of the decedent, claimed before the auditor that the accountants should be surcharged with the sum of $6800, the price of a lease and the furniture, &c., of the "Grant House," a hotel in Philadelphia, which had been sold by Craig as his own to Hartzell, but which the claimants alleged was the property of Shoemaker, the decedent.

In January 1860, Shoemaker, as tenant of Jacob Lukens, occupied the "Grant House," and was the owner of the furniture and hotel fixtures. On the 16th of January 1860, Shoemaker executed to James Craig a bond conditioned for the payment of $3000, with warrant of attorney to confess judgment. Judgment was entered upon it on the 25th of the same month, and on the same day execution was issued, under which the furniture, hotel fixtures, good-will, lease, &c., were levied on; and after setting apart $300 to the defendant, under the exemption laws, were sold by the sheriff on the 31st of the same month. All the furniture and other chattels were sold by the room and purchased by Craig for $1269. The good-will and lease were sold to W. H. Hinchman.

At the time of the execution of the bond to Craig, Shoemaker was indebted to John Hertzler about $2000, on different claims not then due, but maturing in the following March and April; also to Harry Hertzler about $300, due about the same time. On some of these claims judgment had been recovered at the time. It appeared, also, from the statement of appellants, that he was at the same time indebted to John Heath. On his claim judgment was not recovered until February 26th 1863. The amount of the judgment then was $563.36. A few days after the sale, Craig sold the furniture, &c., to Hinchman, the purchaser of the lease, and took his notes in payment. Shoemaker, with his family, remained in the house a short time, and then removed to a hotel at the corner of Columbia avenue and Tenth street, and afterwards to another house on Jefferson street. On the 22d of May 1860,

[Craig's Appeal.]

Hinchman assigned his interest in the lease to Craig, and reconveyed to him the furniture, &c., Craig delivering to him his notes. Craig afterwards conveyed the lease and furniture to Isaac Chadsey, and took his notes in payment. In a few months, and before the notes became due, Chadsey, without notice to Craig, sold to Sheldrake, who, afterwards, for the consideration of $400, gave back the property to Craig. About a year after the sale to Chadsey, Shoemaker, at the request of Craig, returned to the house, and occupied it until his death, which occurred on the 20th of October 1865. The widow retained furniture to the value of $300, under the exemption laws, and continued to occupy the premises until the 1st of April 1866, at which time Hartzell, who had purchased the furniture as above stated, took possession, when the widow removed, taking with her the furniture which had been set off to her.

The auditor reported that before him the above-named three creditors asked to surcharge the administrators of Shoemaker with the proceeds of the sale of the personal property sold to Hartzell, and interest from April 1st 1866, and also the profits of the business of the "Grant House," carried on by the widow, from the 22d day of October 1865, to April 1st 1866, contending:

1. That the entry of judgment by Shoemaker in favor of Craig, on the 16th January 1860, and the sheriff's sale thereunder, were fraudulent, and a scheme to delay, hinder and defraud creditors.

2. That inasmuch as Shoemaker, the defendant in the execution, remained in possession of the personal property after the sheriff's sale as the ostensible owner, and exercising every right of ownership, the title set up by Craig or his administrators to the same, is fraudulent and void as to them.

He further reported as facts in the case, in addition to those before given, that the register of the hotel was opened and kept in Shoemaker's name as agent. It did not appear for whom he was agent. The word agent was written in small letters. During this time, a period of more than four years, Shoemaker paid rent to Craig, and frequently renewed the furniture as the wear and tear required, which was estimated to amount to $400 per year; purchased supplies, employed the hands, and leased and collected the rents of the stores belonging to the premises. These expenses were paid out of the receipts of the business of the house. After his death, and until the sale to Hartzell, the widow remained on the premises, and had the apparent control of the personal property.

Evidence was adduced on behalf of the administrators of Craig, to show that having purchased the said property and not succeeding in its management, he induced Shoemaker, after the lapse of a year or more, to return and assume the control as his agent, at a stipulated weekly salary and board of his family, with the ex-

press understanding that no debts should be contracted by him, and that all moneys, after the payment of expenses, were to be turned over to Craig; and that Shoemaker, in accordance with these terms, remained in possession until his death, when, with the consent of Craig, and by request of the widow, the business of the hotel was conducted by the son-in-law of Shoemaker, until the sale to Hartzell. The substance of the evidence to controvert these positions was:

Ramage, a son-in-law of Shoemaker, acted as general superintendent of the hotel for four years, up to Shoemaker's death; Craig never interfered with the business or financial affairs, nor was consulted about them; no money was paid to him, except for the rent; the weekly returns, &c., were made to Shoemaker. Ramage at first was at a salary, and afterwards, by Shoemaker's arrangement, he received one-eighth of the profits; when Craig was at the hotel, it was as a visitor of the family.

After Shoemaker's death, Craig told Shoemaker's brother, that Shoemaker owed him about $2700; that he would sell the property, take his debt out, and give the remainder to the widow; also, that he had told the brother, about the time of the sheriff's sale, that the judgment on which the property was sold had been given to protect the mutual interest of himself and Shoemaker.

The auditor reported other evidence of declarations of Craig to the same purport; varying the amount in which Craig alleged Shoemaker was indebted to him; also, of distinct declarations of Craig, that the furniture, &c., was Shoemaker's estate. After Shoemaker's death, Craig paid bills that had been contracted by Shoemaker for supplies, furniture, &c., for the house, aggregating about $4000.

On the facts as found by him, the auditor reported:

* * * "Here was a sheriff's sale or a judgment confessed to Craig, a friend and former patron. The personal effects were valued at $7000, and were sold, including the lease and good-will, for $1329. For a brief period after the sheriff's sale, the defendant in the execution remains in quiet possession. Subsequently, however, he relinquishes his control or custody of the personal effects, and removes from the premises; but before the expiration of a year, returns and assumes absolute control, and continues in possession as such for nearly four years, until his death. At the time of the sheriff's sale, debts of Shoemaker were accruing, amounting to over $3000, all of which is now claimed by his creditors, with interest.

It is argued that Shoemaker was merely the agent for Craig. Does the law recognise such agencies?

The possession of Shoemaker for so long a period, even with Craig's consent, as against creditors, is a badge of fraud. The purchases of Craig must be regarded as fraudulent, inasmuch as the price was grossly inadequate, and in view of the fact that

Shoemaker remained in possession as the ostensible owner, being entitled and securing on the strength of such possession the credit of all the world.

It is remarkable that three important debts, contracted by Shoemaker while in possession after the sheriff's sale, were paid after his death by Craig. Bentz & Co.'s bill for liquors, Hough's bill for carpets, and Lowry's bill for beef, were all contracted on the faith of Shoemaker's possession, and necessarily in the course of his business. These bills were charged to him individually, and on his own account. Craig afterwards paid them, and claims credit therefor, as will be seen hereafter.

The law presumes transactions like those to be fraudulent and void, and the facts developed in the history of this case afford a strong illustration of the reason and policy of the law. There was no such change of ownership as would prevent third parties from trusting Shoemaker; and in the case of the bills contracted by him, Craig recognised the justness of the charge by their payment after Shoemaker's death.

Craig never disposed of his supposed interest in the personal property until after Shoemaker's death. His conduct at that time demonstrates that he was acting as administrator of Shoemaker, and not on his own account. * * *

"Under these views of the facts, your auditor finds that the title of Craig was fraudulent as to creditors, and that James Craig's estate must be surcharged with the proceeds of the sale of the personal property of the Grant House, which belonged to the estate of N. Kline Shoemaker, deceased. The administrators of James Craig, deceased, are accordingly surcharged with the sum of $6800, with interest from the 1st day of April 1866, to the 1st of March 1869, amounting in all to $7990." * * *

The auditor then referred to claims made by the administrators, &c., of Craig against the estate of Shoemaker. Amongst these were the balance due on his $3000 judgment; the amount of bills paid by Craig after Shoemaker's death and the sum—fixed by the auditor at $2200—which Shoemaker's brother and others said Craig alleged after Shoemaker's death to be due him.

The auditor surcharged the account with the sum of $6800, the purchase-money of the furniture of the Grant House sold to Hartzell, with $1190 interest. He stated an account against the administrators by which he found in their hands a balance of $7917.43 for distribution amongst the creditors.

He allowed the claims of the Hertzlers and Heath with interest. On the ground that Craig had acted fraudulently in reference to the sheriff's sale, he disallowed all his claims, except $2200, the amount which he had found Craig, after the death of Shoemaker, said was owing to him. The distribution was at the rate of about 90 per cent. on these claims.

During the hearing before the auditor the administrator requested the auditor to recommend the Orphans' Court to direct an issue "to try the question of the ownership of the personal property in the Grant House at Shoemaker's death." The auditor declined to recommend the issue. He filed his report April 2d 1869.

On the 13th of July 1869, the Orphans' Court directed an issue to try the question before a jury in the Court of Cōmmon Pleas, whether the personal property in the Grant House, belonged to N. Kline Shoemaker at the time of his death; the Hertzlers and Heath to be plaintiffs in the issue and the administrators, &c., to be defendants.

Craig's administrators filed exceptions to the auditor's report.

The issue was tried in the Court of Common Pleas, November 22d 1869, before Ludlow, J.

The evidence there was substantially the same as that before the auditor.

Under objection by the plaintiffs, the defendants gave in evidence the bills and receipts in the name of Shoemaker as agent, and other bills and receipts collected after Shoemaker's death by Craig, for matters connected with the hotel, partly before and partly after Shoemaker's death—some in Shoemaker's name as agent, and some in Craig's name. A number of the receipts were for rent paid by Craig to the owner of the hotel: it being admitted that Craig paid the rent to the landlord until July 5th 1866.

The evidence (as before the auditor) was conflicting and somewhat confused, part of it tending to show that the ownership was in Shoemaker, and part that it was in Craig. It is so fully considered and analyzed in the opinion of Judge Woodward as to require no further statement.

The verdict in the issue was for the defendants, and a rule for a new trial was discharged.

The record of the issue was certified to the Orphans' Court, and the exceptions to the auditor's report were then argued.

After the argument, the following opinion of the Orphans' Court was delivered by Ludlow, J.

"This case has a special history. When it came before the court several years ago, twenty-five exceptions were filed to the report of the auditor. An effort was then made to send the case to a jury in the Common Pleas upon an issue framed for that purpose. After argument, an issue was awarded. This issue was tried, and a verdict rendered in favor of Craig's estate, and therefore against the findings of the auditor.

"The exceptions to the auditor's report are again before this court, and we are also informed of the result of the jury trial upon the issue framed. The evidence produced, and the proceedings had in the Common Pleas, are all before us now, and we must proceed to dispose of the exceptions to the auditor's report. It

requires no argument to prove that we may decline to be governed by the verdict of the jury. An issue awarded out of the Orphans' Court is precisely like an issue out of a court of chancery; for the Orphans' Court, exercising jurisdiction analogous to that of a court of equity, is to be governed by the same principles. The whole object of the issue is to satisfy the consciences of the judges; and if, after a careful inspection of the records and proof submitted at the trial, the consciences of the judges are not satisfied, it is their plain duty to disregard the verdict. In Mill's Appeal, 10 Harris 325, the Supreme Court restate these principles; and as they cannot be doubted, we shall act upon them.

"The contest in this case arose out of an alleged effort made by one James Craig, administrator of Shoemaker, to protect the property of Shoemaker from the lawful demands of his (Shoemaker's) creditors.

"The auditor found that Craig had bought the personal property of Shoemaker at the 'Grant House' for a fraudulent purpose; and as no title passed, he or (as he is now dead) his estate must be surcharged with the proceeds of the sale of this personal property.

"The jury in the feigned issue found otherwise, but we are satisfied that that verdict ought not to stand, and that the finding of the auditor was right.

"It is true that I, as the judge of the Common Pleas who tried the issue, refused a motion for a new trial; but as this action of the court was only technical, and as I did not see any objection to the legality of the trial, the result upon the motion made could not have been different. Now, however, and in the Orphans' Court, when called upon critically to examine the evidence produced at the trial, I cannot say that it or its result ought to have any weight in the final settlement of this controversy.

"The circumstances attending this sheriff's sale, the manner in which it was conducted, the price which the property brought, the appearance and reappearance at the house of Shoemaker, the manner in which the business was conducted by him, and the statement made by Craig himself, as proved by the testimony of one witness, to wit: that 'he had so much against the property, and the balance belonged to Shoemaker; that he owed him $2000, to reach his (the witness') debt—the balance was to be paid in instalments, which were to go to Kline Shoemaker;' all appear to bear but one construction, and that one not favorable to the exceptants.

"In reviewing the evidence at the trial, we cannot but believe that the introduction of testimony in the nature of bills and receipts collected after Shoemaker's death, by Craig, had much to do with this verdict; and while I do not yet see that it was not legal testimony, yet my brother Allison and myself think it had an unjust and most injurious weight with the jury.

[Craig's Appeal.]

"After a very careful and protracted examination of all the evidence, we are forced to disregard this verdict, and to sustain the auditor." * * *

The court thereupon decreed * * * "that the said John Maugel and Reynels Cowden Craig, administrators as aforesaid, pay the amount of the estate of the said Nicholas Kline Shoemaker, as found by the auditor to be in the hands of the said James Craig at the time of his death, out of the estate of the said James Craig in their hands, with interest from the time of filing the said report, to the persons entitled thereto according to the report of the auditor."

The administrators of Craig appealed to the Supreme Court and in several specifications, assigned for error: the dismissal of their exceptions and the decree of the Orphans' Court.

*J. Otterson* and *W. L. Hirst*, for appellants.—After such delay as is here the presumption is, that the sheriff's sale was a lawful sale, and that the debt was an honest debt. The auditor had no right, in this collateral proceeding, to set either aside: Wilkinson's Appeal, 4 Barr 284; Richards *v.* Elwell, 12 Wright 365. Craig having purchased at a judicial sale had the legal right to employ Shoemaker as his agent to keep the hotel: Myers *v.* Harvey, 2 Penna. R. 478; Dick *v.* Cooper, 12 Harris 220; Walter *v.* Gernant, 1 Harris 515; Streeper *v.* Eckart, 2 Whart. 307; Schott *v.* Chancellor, 8 Harris 199.

*S. N. Rich*, for appellees, from whom the reporter received no paper-book.

Mr. Justice WOODWARD delivered the opinion of the court, May 10th 1875.

The duty assigned by the Orphans' Court to the auditor whose report is the subject of discussion here, was to investigate and decide a question arising out of a series of transactions which were alleged to have been tainted by fraud in intent and act, and whose results, as against the present appellees, were alleged to be, therefore, void. Instead of entering upon the examination of the evidence with his mind directed to the true point of the controversy, he assumed at the outset that the sheriff's sale of N. K. Shoemaker's property to James Craig and the subsequent possession by Shoemaker were a fraud in law. After stating the general facts, the auditor opened the discussion of the testimony by saying: "The law presumes transactions like these to be fraudulent and void, and the facts developed in the history of this case afford a strong illustration of the reason and policy of the law. There was no such change of ownership as would prevent third parties from trusting Shoemaker." The rule of Myers *v.* Harvey, 2 Penna. R. 478,

was entirely disregarded. That rule, which has been repeatedly affirmed and uniformly recognised, was stated by Gibson, C. J., in these words: "Retention of possession by the former owner of a chattel sold at sheriff's sale, is not an index of fraud, because the sale is not the act of the person retaining, but of the law; and because a judicial sale, being conducted by the sworn officer of the law, shall be deemed fair till it is proved to be otherwise. A chattel thus purchased, then, may safely be left in the possession of the former owner on any contract of bailment the law allows in any other cases." Starting with the mistaken theory of the existence of a legal fraud, it is by no means surprising that the opinion of the auditor upon the effect of the testimony was different from that of the jury on the trial of the issue directed to the Common Pleas, and different from that which has been reached by this court.

In January 1860, N. Kline Shoemaker was keeping a tavern at the corner of Eighth and Spring Garden streets, then known as the Richards House, and afterwards called the Grant House. On the 16th of January, he confessed a judgment to James Craig for $3000. There is nothing in the record to show that this judgment was not for a sum of money actually due. On the contrary, Mr. Bonham testified that "it was not for any more than Shoemaker owed from his statement and the examination of the book." A fieri facias was issued, a levy was made on the furniture in the tavern, property of the value of $300 was set out to the defendant on his exemption claim, and on the 31st of January, the residue of the furniture was sold to Craig for the sum of $1269, and the lease of the premises was sold to William H. Hinchman for $200. Shortly afterwards Craig sold the furniture to Hinchman, who took possession of the tavern. It was found he could not pay for the property, and Craig repurchased it, buying the lease at the same time, and paying to Hinchman the $200 he had bidden at the sheriff's sale. Craig then sold to Isaac Chadsey, who was in possession some months, and sold out to Sheldrake. He discovered that in Sheldrake's hands his security for the purchase-money would be valueless, and an arrangement was made between them by which Sheldrake surrendered possession of the property on payment of $400 by Craig. In the meantime, Shoemaker, who had remained in the house a short time after the sheriff's sale, had removed first to a house at the corner of Tenth street and Columbia avenue, where he lived about a year, and afterwards to a house on Jefferson street. Failing in the efforts he had made to dispose of the property, Craig asked Shoemaker to take charge of it and manage the house as his agent. The proposition was accepted, and Shoemaker returned under an arrangement that he should receive a weekly allowance, that his family should be boarded in the house, and that he should contract no debts. He remained there until

his death on the 20th of October 1865. A. H. Ramage, his son-in-law, carried on the business until the 1st of January 1866, when Craig sold the furniture to A. D. Hartzell for $6800. After Shoemaker's death, the existence of debts incurred in the management of the house to the amount of $4000, was discovered, and these debts Mr. Craig paid.

Letters of administration upon the estate of Shoemaker were granted to his widow and Mr. Craig. They filed their account on the 13th of March 1867. Before the auditor to whom the account was referred, a successful effort was made to surcharge the estate of Craig (who died in January 1868, before the hearing commenced) with the $6800 received from Hartzell for the Grant House furniture. The auditor reported that the sheriff's sale was fraudulent; that the property belonged to Shoemaker at the time of his death; that Craig's whole claim should be reduced to $2200; and that his estate was entitled to no dividend on account of the judgment for $3000, and no dividend on the $4000 of debts which he had paid. After the report was returned an issue was awarded, a verdict in favor of Craig's administrators was rendered, and a rule for a new trial was entered and discharged. Upon the subsequent argument of the case in the Orphans' Court, the exceptions which had been taken by the appellants were dismissed, and the report of the auditor was confirmed.

From the date of the sheriff's sale to the time when the administration account was filed, no steps were taken by the appellees to test the regularity of the proceedings under the judgment, or to collect their own claims. All the items of John Hertzler's debt became payable during the year 1860; the judgment of Harry Hertzler was entered on the 25th of February 1860; and that of John Heath on the 26th of February 1863. The property in dispute had been within the reach of two of these judgment-creditors for the period of seven years, and within reach of the third for a period of four, when this effort to surcharge the administrators of Craig was made. After a delay so long continued, nothing short of clear, decisive and unmistakable evidence could have the effect to annul and avoid a transfer of the title to personal property by a judicial sale. Craig's claim of ownership did not rest on the acts of the parties. It rested upon a judicial record and the acts of an officer of the law. Shoemaker had acquiesced throughout. He recognised the title of Craig down to the day of his death. For sixteen months after the sale, all his connection with the property was severed. In that interval, and with the judgments of two of the appellees ready for execution, Craig was permitted to make contract after contract in relation to the furniture and the lease of the house. The rent was paid to the landlord through him. And from the time Shoemaker was invited to return and resume

the charge of the house, he pretended to hold no other relation than that of agent for Craig.

A thorough analysis of all the testimony upon which the decision of the auditors was based, would involve a good deal of gratuitous and superfluous labor. It was conflicting, vague and inconclusive. There is scarcely an item of it of the definite character which the case required. Taking the facts shown on the part of the appellees alone, they would fail to support the claims of creditors who had slept on rights now so vigorously asserted for seven years, and who did not take out of the office of the Orphans' Court the certificate of the appointment of the auditor until after the death of Craig. The testimony of the witnesses David K. Shoemaker, Ramberger and Oldham, that at different times after N. K. Shoemaker's death, Craig said he would give the money received for the furniture to the widow, after deducting the amount due him, was not only consistent with his ownership of the property, but the declaration amounted to an assertion of such ownership. As the widow of an utterly insolvent intestate, Mrs. Shoemaker would have been entitled to nothing, of course. One may do what he will with his own, and the promise proved by these witnesses would harmonize entirely with all that was proved of the relations between Shoemaker and Craig, which were manifestly those of beneficiary and benefactor. It is true that Thomas L. Worthington swore that Craig said the balance beyond his debt of about $2000 belonged to Shoemaker's estate, but that statement is inconsistent with the account given by the other witnesses of what occurred in conversations that must have been identical, for Worthington is proved to have been present on two occasions when the subject was discussed in the presence of Ramberger and Oldham. The only direct evidence cotemporaneous with the sheriff's sale to affect its validity and good faith, was that of D. K. Shoemaker, who said that Craig declared the object of the sale and purchase was to protect the mutual interests of N. K. Shoemaker and himself. In view of a regular judgment, a regular execution, the due performance of his official functions by the sheriff, the surrender of the property by Shoemaker, his removal from the premises, and his acquiescence in the title of Craig throughout his lifetime, it is sufficiently clear that whatever else the language of the witness may be taken to imply, it can raise no doubt of the understanding of the parties concerned that the title to the furniture was vested in Craig. There remain the statements of Hartzell and his father-in-law, Gerhart, that Craig said the property he sold to Hartzell belonged to Shoemaker's estate. Against these statements are arrayed not only the evidence of the other witnesses for the appellees in regard to the language used in the conversations which they heard, and the evidence furnished by the written contract with Hartzell, which shows the sale to have been

apparently made by Craig in his individual right, but the proof also of the whole course of dealing for five years ; of the absolute ownership exercised after the sheriff's sale, as shown by the contracts made with Hinchman, Chadsey and Sheldrake; of the acts and declarations of Shoemaker, as sworn to by George Wood, Lewis Bitting and Ephraim C. Bush; of the business transactions by the parties, explicitly and clearly described by Mr. Bonham; and of the pregnant fact that after Shoemaker's death, Craig paid unanticipated debts that had been improvidently incurred to the amount of $4000. The discrepancy between the amount bidden at the sheriff's sale and the sum for which the furniture was sold to Hartzell, was pressed as a ground for deducing fraud in the transaction. The discrepancy was large, and it may indicate that the amount produced by the sheriff's sale was less than the value of the property. But this is not an unusual incident of such sales, and mere inadequacy of price, even if it were clearly established, would not alone affect proceedings that were in accordance with forms of law. Regard must be had also to the fact that startling changes had been made in all values by the disturbances of the currency of the country between January 1860 and January 1866. There was not in the whole volume of the testimony, material to warrant the decision of the auditor.

If doubt were entertained of the accuracy of this conclusion, the verdict of the jury in the feigned issue would, in view of the character of the evidence, be itself conclusive. The order for the issue was most discreetly made. The case was one which peculiarly required the intervention of a jury of plain business men, and an investigation of the questions in dispute by them under the legal guidance of an experienced judge. There is no other form of inquiry so thorough, so unprejudiced, so accurate and so safe. The verdict was allowed to stand, and it should have controlled the decree of the Orphans' Court. The main reason given for disregarding it by the learned judge who decided the cause, was the "unjust and most injurious weight with the jury" which the "testimony in the nature of bills and receipts collected after Shoemaker's death by Craig" was assumed to have had. The right of the jury to weigh the value of the evidence was unquestionable. The court were to decide upon its competency, and as to that, no doubt seems to have been felt in the court below. The question in issue was one of actual fraud. This evidence showed the connection of Craig with the property after Shoemaker's death, it is true, but before any claim on the part of the contesting creditors had been asserted, and before any question of title had been raised. There had been proof that Shoemaker was Craig's agent. The debts had been contracted in violation of the agreement between them, but under circumstances that forbade a denial by Craig of the authority of Shoemaker to bind him. On the mere technical

ground that it tended to contradict Ramage, on whom the appellees relied to establish ownership in Shoemaker, the offer was admissible, for the creditors whom Craig paid had been sent by Ramage to him. But for general and broad reasons, in a case like this, involving a charge of fraud, the admission of evidence of acts done before any rights of the appellees had supervened, which tended to illustrate the conduct of the parties and develop the truth of their relations, was amply justified by recognised and accepted rules.

The decree of the court below is reversed, and the report of the auditor is set aside; and upon the filing in the Orphans' Court of a certificate of the verdict and judgment in the feigned issue in the Common Pleas, it is decreed that the account of the administration of the estate of N. Kline Shoemaker, deceased, filed in the register's office on the 13th of day March 1867, be confirmed; and it is further decreed that the costs of all proceedings subsequent to the filing of that account in the Orphans' Court be paid by the appellees.